632 So.2d 1162 (1994)
Joan M. GILBERT, et vir., Plaintiffs-Appellees-Appellants,
v.
Donald W. LABORDE d/b/a Chiropractic Diagnostic and Treatment Center and National Chiropractic Mutual Insurance Company (NCMIC), Defendants-Appellants-Appellees.
No. 93-761.
Court of Appeal of Louisiana, Third Circuit.
February 2, 1994.
Rehearing Denied March 11, 1994.[*]
*1163 Andrew E. Schaffer, Alexandria, for Donald Laborde, et al.
George Arthur Flournoy, Alexandria, for Joan M. Gilbert, et vir.
Before GUIDRY and YELVERTON, JJ., and BERTRAND, J. Pro Tem.
GUIDRY, Judge.
In this bifurcated trial, defendants, Dr. Donald W. Laborde and his insurer, National Chiropractic Mutual Insurance Company (NCMIC), appeal the trial judge's judgment in favor of plaintiff, Clyde Gilbert, in the amount of $5,000 on his loss of consortium claim. Plaintiff, Joan M. Gilbert, after her motion for judgment notwithstanding the verdict was denied, appealed the jury verdict in favor of defendants dismissing her claim against Dr. Laborde.

FACTS
Sometime in late February or early March, 1989, plaintiff, Joan Gilbert, participated in a garage sale. While preparing for the sale, Mrs. Gilbert was squatting with a full box of sale items when her right knee "gave way" and became painful. As the pain persisted for several weeks, she decided, on March 22, 1989, to consult defendant, Dr. Donald Laborde, a chiropractor. Because of plaintiff's pain and limited range of motion on the March 22nd visit, Dr. Laborde, aside from taking plaintiff's medical history, did only an abbreviated examination and placed Mrs. Gilbert on isometric exercises to strengthen the knee while allowing the pain to subside. At that point, Dr. Laborde suspected Mrs. Gilbert had sustained a right knee sprain/strain. There is conflicting testimony as to any history *1164 of left knee problems. One week later Mrs. Gilbert returned for interferential (electrical) stimulation to ease her pain. At that time, it was noted that she was improving.
Mrs. Gilbert returned to Dr. Laborde's office for a full examination of her right knee problem on April 18, 1989. As she was doing considerably better, Dr. Laborde was able to perform a complete knee examination. The findings of that examination were recorded on plaintiff's chart by Dr. Laborde's assistant, Ms. Melynda Gilliland. Dr. Laborde tested several muscles in Mrs. Gilbert's legs finding some weakness in the right leg that was not present in the left leg. Bilateral circumferential measurements of her knees showed slight swelling in the right knee. Additionally, Dr. Laborde performed a bilateral ROM (range of motion) examination of her knees which showed the right knee to have a ROM of 120° with slight pain and 135° ROM of her left knee with no pain. Dr. Laborde performed the ROM exam by having the patient lay on her stomach on the examination table and then he flexed (bent at the joint) the knee until he reached resistance.
Based upon his April 18, 1989 examination of plaintiff, Dr. Laborde diagnosed her problem as patellar femoral arthritis (PFA), a degenerative inflammatory condition under the kneecap (patella). Inasmuch as PFA usually occurs bilaterally, Dr. Laborde treats PFA based upon that premise. Dr. Laborde's treatment plan consisted of bilateral hamstring stretches (also known as straight leg stretches), bilateral hip flexion and bilateral knee extension exercises to be performed on a weight machine, and interferential (electrical stimulation) therapy for pain control. Mrs. Gilbert was to follow the treatment plan for one month, and then be re-evaluated.
On April 21, 1989, prior to beginning the rehabilitation plan, Dr. Laborde had Mrs. Gilbert return to his office for the purpose of making a videotape of the positive tests (the bilateral muscle tests and bilateral ROM exam of the knees) noted on the April 18, 1989 knee examination. Melynda Gilliland videotaped Dr. Laborde going through the positive tests with Mrs. Gilbert. Dr. Laborde desired the video for comparison purposes with a later planned examination because a video best shows the comparison.
The rehabilitation plan began on April 24, 1989. Ms. Gilliland supervised Mrs. Gilbert under Dr. Laborde's direction in following the plan. The exercises which made up the plan (knee extension, hip flexion and stretching) were always done on both legs. Mrs. Gilbert came into the office and went through the rehabilitation plan on April 24, April 26, April 28, May 1, May 5, May 8, May 10, May 15, May 17 and May 19, 1989. Ms. Gilliland was there on each of these occasions assisting Mrs. Gilbert through the exercises and recording in the office records on each of these dates, what was done. Although Dr. Laborde was not in the treatment room continuously while the plan was being carried out, he would come in to evaluate plaintiff's progress and to perform needed manipulations.
During the May 17, 1989 treatment, Dr. Laborde for the first time performed a quadricep stretch on Mrs. Gilbert. He also did a hamstring/straight leg stretch on plaintiff and she went through knee extension and hip flexion exercises as well as interferential stimulation. Inasmuch as this was the first time Ms. Gilliland had observed Dr. Laborde perform the quadricep stretch, she made particular note of the procedure.
At trial, Ms. Gilliland described to the jury how Dr. Laborde performed the quad stretch and Dr. Laborde also described and demonstrated it twice. Ms. Gilliland testified that the way Dr. Laborde demonstrated the quadricep stretch to the jury was the way he had in fact performed it on Mrs. Gilbert. Although Mrs. Gilbert testified at trial that during the quad stretch she experienced a severe pain in her left knee, she informed neither Dr. Laborde nor Ms. Gilliland of any pain and Dr. Laborde's records make no note of any complaint.
Subsequently, on May 19, 1989, Mrs. Gilbert telephoned and Ms. Gilliland wrote in the chart that Mrs. Gilbert reported her "knee" felt tight and full with decreased range of motion. As Dr. Laborde was treating Mrs. Gilbert's right knee, there was no *1165 reason to record in the chart which knee was causing the problem unless she specified a complaint about her left knee. That would have been a major change which Ms. Gilliland would have recorded. Dr. Laborde gave instructions which Ms. Gilliland relayed to plaintiff to put ice on it. Mrs. Gilbert came into the office later that same day and Dr. Laborde performed the quad stretch again. Mrs. Gilbert also did the knee extension and hip flexion exercises, and also underwent interferential therapy. Mrs. Gilbert did not exhibit any difficulties walking when she came into the office, neither did she have any problems doing the bilateral exercises nor did she complain of left knee pain. If she had, Ms. Gilliland would have recorded it on the chart, Dr. Laborde would have ordered the weights changed, and the change would have been recorded.
Dr. Laborde further testified that had the patient reported any significant pain, he would have stopped the rehabilitation program completely and returned her to the isometric program until the pain subsided.
Mrs. Gilbert returned May 23, 1989 for the planned re-evaluation examination. This examination, like the one on April 21, 1989, was video taped by Ms. Gilliland. Among other things, the video tape shows decreased ROM and discomfort upon flexion of both knees when compared to the April 21, 1989 video. However, once again, Mrs. Gilbert neither complained to Dr. Laborde or Ms. Gilliland of excessive pain nor did she state that she believed Dr. Laborde had injured her left knee during previous treatment.
That was the last time Dr. Laborde treated Mrs. Gilbert. Shortly after May 23, 1989, she went on vacation out of state. Upon returning she did call the office complaining of pain and swelling of her knee without specifying it was now her left knee and not her right one which was bothering her. At that point, Dr. Laborde told her to discontinue any further rehabilitation exercises, put intermittent ice packs on the knee, start over on the isometric exercises and come into the office in two weeks. No further contact was had until December, 1989, when Mrs. Gilbert called to complain of continued problems with her left knee. Ms. Gilliland, who took the call, testified that she was surprised to hear plaintiff complain of problems with her left knee, as Dr. Laborde had been treating the right knee and she had never heard Mrs. Gilbert complain of any problem with her left knee.
On January 26, 1990, Mrs. Gilbert consulted Dr. Douglas Gamburg, an orthopedic surgeon, who after examining plaintiff diagnosed arthritis in both knees, and, because of tenderness to pressure over the medial joint line of the left knee, suspected a tear of her left medial meniscus. X-rays confirmed the diagnosis of arthritis and an MRI of the left knee confirmed a tear of the medial meniscus. From the history related by Mrs. Gilbert, Dr. Gamburg opined that it was more probable than not that Dr. Laborde had caused the tear in her medial meniscus by hyperflexing her knee.
Upon learning of Dr. Gamburg's opinion and that surgery would be required to repair the torn meniscus, Mrs. Gilbert contacted Dr. Laborde seeking to have him either pay for all or part of her needed surgery. Dr. Laborde denied that anything he did could have torn Mrs. Gilbert's medial meniscus and refused to pay. This suit ensued.

DIRECTED VERDICTPOSTURE OF CASE
La.R.S. 37:2801(3) states:
(3) "Practice of chiropractic" means the holding out of one's self to the public as a chiropractor and as being engaged in the business of, or the actual engagement in, the diagnosing of conditions associated with the functional integrity of the spine and treating by adjustment, manipulation, and the use of the physical and other properties of heat, light, water, electricity, sound, massage, therapeutic exercise, mobilization, mechanical devices, and other physical rehabilitation measures for the purpose of correcting interference with normal nerve transmission and expression. A chiropractor may also make recommendations relative to personal hygiene and proper nutritional practices for the rehabilitation of the patient. The practice of chiropractic does not include the right to prescribe, dispense, or administer medicine or *1166 drugs, or to engage in the practice of major or minor surgery, obstetrics, acupuncture, x-ray therapy, or radium therapy, or engage in computerized axial tomography, nuclear magnetic resonance, nuclear magnetic imaging, or nuclear medicine.
At the close of evidence, plaintiff moved for a directed verdict on two issues: (1) that the actions of defendant were outside the scope of the practice of chiropractic as defined by statute; and, (2) that inasmuch as defendant undertook to treat a knee injury, he should be held to the standard of care expected of an orthopedist and inasmuch as he failed to meet that standard of care, a directed verdict as to Dr. Laborde's liability should be entered. The trial judge granted the motion as to issue number one, but denied it as to the second issue. Since neither issue is raised on appeal, we will not comment on these rulings. The result of the aforementioned rulings sent the case to the jury as a liability case on the issue of Dr. Laborde's negligence and its causal connexity with Mrs. Gilbert's injury. (La.C.C. art. 2315).
We digress at this point to note that for some reason, unexplained in the record, the trial judge allowed the jury to determine the issue of defendant's negligence and its causal connexity with Mrs. Gilbert's alleged injury only as between plaintiff, Joan Gilbert, and defendants. The trial court reserved that issue to the court insofar as concerned the claim of Clyde Gilbert for loss of consortium.
In this connection, we observe that, some months prior to trial, plaintiffs amended their petition to specify that Clyde Gilbert was entitled to recover damages for loss of consortium but in an amount not exceeding $20,000. Presumably, in light of this amendment, the trial court concluded that Clyde Gilbert's claim, being less than $20,000 exclusive of interest and costs (La.C.C.P. art. 1732), should be tried and determined by the court. In any event, the record reflects that the trial judge conducted a bifurcated trial.
The jury concluded, in special interrogatories, that defendant's, Dr. Laborde's, treatment was not a cause of Joan Gilbert's injury. The trial judge, for written reasons assigned, concluded that a preponderance of the evidence showed that Mrs. Gilbert suffered a torn meniscus as a result of Dr. Laborde's actions and awarded Clyde Gilbert $5,000 for loss of consortium. Thereafter, a formal judgment dismissing Joan Gilbert's claim against defendants, with prejudice, but granting Clyde Gilbert's claim for loss of consortium was rendered and signed on January 14, 1993. Subsequently, plaintiff, Joan Gilbert, filed a motion for a judgment notwithstanding the verdict, which the trial court denied. This appeal followed.
Plaintiff, in arguing for reversal of the jury's verdict urges that in a bifurcated trial, where the jury and judge reach conflicting findings of fact, the appellate court should render a single harmonized decision on the record as a whole after determining which decision is more reasonable. In support of her argument, plaintiff cites Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3rd Cir. 1987), writs denied, 522 So.2d 562, 563 (La. 1988). We note that in arguing for affirmation of the loss of consortium award plaintiff states: "Since the trial court's award of damages in the loss of consortium claim is not in conflict, it must be reviewed under the clearly erroneous standard".

SCOPE OF APPELLATE REVIEW
In light of the foregoing, the single most important issue on appeal concerns the proper scope of appellate review.
If this was a properly bifurcated trial, the contrary findings by the jury and the trial judge on the issue of defendant's negligence render inapplicable the manifest error rule and requires this court to resolve the differences and render a single harmonized decision based upon the record as a whole. Morales v. Tetra Technologies, Inc., 608 So.2d 282 (La.App. 3rd Cir.1992), writ denied, 610 So.2d 818 (La.1993); Felice, supra. On the other hand, if a decision on the issue of defendant's negligence was solely within the province of the jury, then the trial judge's contrary decision on the issue of defendant's negligence vis-a-vis the loss of consortium claim is without effect and the decision of the jury on the issue of defendant's negligence must be reviewed under the manifest error or clear error standard.
*1167 In this case, we find that the defendants were entitled to a jury trial on all issues because the nature and amount of the principal demand warranted a trial by jury. La.C.C.P. arts. 1731 and 1732. The trial court clearly erred, as a matter of law, in concluding otherwise.
Defendants timely applied for and were granted a jury trial under La.C.C.P. art. 1733. Defendants did not specify which issues they wished to be tried by the jury. Accordingly, pursuant to the provisions of La.C.C.P. arts. 1735 and 1736, all issues to which the moving parties were entitled to a trial by jury were to be so tried, unless the parties stipulated otherwise. There is no stipulation to the contrary in the record.
The nature and amount of the principal demand determines whether any issue in the principal or incidental demand is triable by jury. La.C.C.P. art. 1731; Cambridge Corner Corporation v. Menard, 525 So.2d 527 (La.1988). Although a claim for loss of consortium by a spouse may constitute a separate cause of action from that of the injured spouse (see Poirier v. Browning Ferris Industries, 517 So.2d 998 (La.App. 3rd Cir.1987), writ denied, 519 So.2d 105 (La.1987)), both causes of action are properly cumulated and triable in the same judicial demand. La.C.C.P. arts. 461 et seq. A claim for loss of consortium is derivative of and dependent upon the principal demand for damages of the injured spouse.
In our view, where separate causes of action are properly cumulated in the same judicial demand by one or more plaintiffs against one or more defendants, a jury trial, timely and properly granted to the defendant(s), extends to all issues in the cumulated actions unless the parties stipulate otherwise; unless the right to trial by jury as to certain issues does not exist; or, unless the trial court orders a separate trial of the properly cumulated actions pursuant to La.C.C.P. art. 465. We find none of the exceptions applicable in this case. Further, we determine that the voluntary reduction by Mr. Gilbert of his cumulated demand for loss of consortium to an amount not to exceed $20,000 did not have the effect of depriving the jury of jurisdiction to decide that issue.
The interrogatories propounded to the jury requested a response to the following question:
1. Was Dr. Laborde's treatment a proximate cause of Joan Gilbert's left knee injury?
The jury answered no to that question. Although the interrogatories propounded to the jury omitted any reference to Mr. Gilbert's loss of consortium claim, this is of no moment. Mr. Gilbert's loss of consortium claim against Dr. Laborde is a derivative action, i.e., one arising from another source; not original, which relied upon a finding that Dr. Laborde injured Mrs. Gilbert. The jury's finding that Dr. Laborde did not cause Mrs. Gilbert's injury rendered moot Clyde Gilbert's claim for loss of consortium.
Accordingly, for the foregoing reasons, we have reviewed this record under the manifest error standard of appellate review and for the reasons which follow, we affirm the trial jury's conclusion.

MANIFEST ERROR REVIEW
In denying plaintiff's motion for judgment notwithstanding the verdict, the trial judge stated, in pertinent part, as follows:
While I obviously do not agree with the finding of the jury, a JNOV is not proper. Contrary to Plaintiff's Counsel's contention, this is a credibility call. Our Third Circuit has repeatedly, and recently, held that the Judge should not use JNOV procedures to pass on the credibility of the witnesses, weigh the evidence, or substitute its judgement [sic] for that of the jury. See, Lopez v. Chicago Bridge and Iron Co., 546 So.2d 1323,[1] La.App. 3rd Cir.1989. While liability is clear to me, reasonable minds could arrive at a contrary finding.
The observations of the trial judge clearly show there was conflict in the testimony and evidence presented at the trial. Our examination of the record confirms there was conflict not only in the testimony of the expert witnesses who testified for each side, but also *1168 in the lay testimony. All the experts agreed that the videotapes introduced at trial of the two evaluations of plaintiff's range of motion of her knees revealed no action on the part of Dr. Laborde that could have caused her injury. However, Mrs. Gilbert's treating orthopedic surgeon, Dr. Gamburg, was of the opinion that it was more probable than not that hyperflexion of Mrs. Gilbert's knee by Dr. Laborde caused the tear in her medial meniscus. This opinion, the doctor admitted, was based solely on the history supplied to him by Mrs. Gilbert. On the other hand, Dr. Gamburg confirmed that a torn meniscus could be sustained while engaging in everyday events such as squatting or getting out of an automobile or by twisting the knee, stepping in a hole or a variety of other events.
While Dr. Grossman, plaintiff's other expert, was of the opinion that passive hyperflexion of the knee, without weight bearing or rotation could cause a meniscus tear, Dr. Richard Ackerman, a defense expert, disagreed and opined that the most likely cause of plaintiff's injury was either a combination of flexion and rotation while weight bearing or extension and rotation while weight bearing. Dr. Ackerman further stated that Mrs. Gilbert most likely caused her injury by her own actions.
In Gulf American Industries v. Airco Industrial Gases, 573 So.2d 481 (La.App. 5th Cir.1990), our brethren of the Fifth Circuit, with whom we agree, stated:
It has been well established that an appellate court may not set aside the findings of fact made by the trial court in the absence of manifest error or unless the evidence shows that such finding is clearly wrong. Rosell v. Esco d/b/a Jolly Elevator Corp., 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there are two reasonable or permissible views of the evidence and the trial court chooses to find more credible one witness' testimony than another, the appellate court cannot reverse such finding because, in their judgment, they would have lent more credence to another witness' testimony instead. Under such conditions, great deference must be given to the finding of the trier of fact.
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
. . . . .
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of facts's findings; for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness' story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness' story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact-finder's finding is based on its decision to credit the testimony of one of two or more witnesses that finding can virtually never be manifestly erroneous or clearly wrong. [citations omitted] Rosell, supra, at pages 844-845.
See also Corbello v. Southern Pacific Transportation Company, 586 So.2d 1383 (La.App. 3rd Cir.1991), writ denied, 589 So.2d 1052 (La.1991), and Prejean v. Commonwealth for Community Change, Inc., 503 So.2d 661 (La. App. 3rd Cir.1987).
Inasmuch as the jury verdict was based upon its evaluation of the testimony of the many witnesses and their credibility and there is no objective evidence in the record which would support a finding by this court *1169 that the jury verdict rendered in this case was clearly wrong, we affirm the jury's verdict.
It necessarily follows that if Dr. Laborde was free from fault in causing Mrs. Gilbert's injury, he cannot be held liable for any loss of consortium sustained by Mr. Gilbert due to his wife's injury.
Accordingly, for the reasons stated, the judgment in favor of Dr. Laborde dismissing Mrs. Gilbert's claim for damages is affirmed. The judgment against Dr. Laborde awarding Clyde Gilbert damages for loss of consortium is reversed and set aside. All costs of this appeal are assessed against plaintiffs, Clyde and Joan Gilbert.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

ON APPLICATION FOR REHEARING
YELVERTON, Judge.
I vote to grant a rehearing in this case. We may well have used the wrong standard of review. I think we might have been wrong in holding that the judge had no authority to bifurcate and decide the consortium claim. I also think we should rehear the case to look at a serious deficiency in the jury charges.

The Bifurcation
During the interval between the decision on appeal and the application for rehearing the trial judge, at the request of counsel, filed a per curiam addressing the issue of bifurcation. The record supports everything the per curiam says.
His reasons for judgment written after the trial of this case stated that "the parties agreed that the husband's claim for loss of consortium would be tried to the bench." There is a wealth of substantiation in the record that there was in fact such an agreement. It is clear from the record that the judge and both parties agreed to a bifurcation. The trial judge did not have to bifurcate the consortium claim, but he did, and everybody agreed. Their agreement had the effect of a stipulation. The bifurcation was not assigned as error on this appeal. I have doubts whether we can now say that his trial of the bifurcated case was error, and that we may ignore it and review only the jury's verdict for manifest error. Our decision that the trial judge erroneously bifurcated the case was a gratuitous ruling, and, I now think, it might well have been a wrong ruling.

Loss of Consortium: Effect of its Derivative Nature
The successful claimant for loss of consortium damages has to prove three things: the liability of the defendant, his or her spouse's damages, and his or her consequent loss of consortium damages. There is nothing in this record to suggest that the bifurcation of the consortium claim was limited to only certain elements. Rather, the record suggests that the loss of consortium claim by Mr. Gilbert, in its entirety, was to be tried by the judge, while Mrs. Gilbert's claim was to be tried by the jury. Although the consortium claim is derivative of the primary victim's damages, it is nevertheless a separate cause and right of action belonging to the other spouse. Aldredge v. Whitney, 591 So.2d 1201 (La.App. 2nd Cir.1991). The loss of consortium claim is not derivative of the primary victim's ability to assert a claim. Id. The ability to assert a claim is meaningless if it is limited to the assertion of a claim for damages, because without proof of liability, damages cannot be awarded. The trial judge in the present case had the responsibility, based on the agreement of the parties, for deciding the entirety of the consortium claim.

Effect of Conflict in Findings
It may be that instead of reviewing the jury's verdict for manifest error, we should have reviewed under the standard of harmonizing, i.e., which decisionthe jury's verdict or the trial judge's decisionwas the more reasonable. What we're dealing with here is a single finding of fact: proximate cause. One finder of fact said Dr. Laborde's action was the proximate cause of Mrs. Gilbert's injuries. The other said it was not. The standard of review could make a difference.
*1170 This is the first reason for my vote to grant a rehearing. The other, independent reason why I think we should grant a rehearing in this case, is even more troublesome. It has to do with the total absence of a plain, fundamentally necessary charge to the jury.

Jury Charge Error
The only liability finding that the jury was asked to make was proximate cause. The judge directed a verdict as to all other elements, apparently in plaintiffs' favor. The jury charges and interrogatories told the jury that all they had to decide was whether the actions and activities of Dr. Laborde were the proximate cause of Mrs. Gilbert's injury. Yet, strangely, there was no jury charge definition of either proximate cause or cause-in-fact.
The failure to define for the jury the only element of liability submitted to them for decision is a serious problem in this case that needs further consideration. The plaintiffs objected to the failure to give a requested res ipsa loquitur instruction. I would like to hear arguments on whether this was sufficient to preserve the right to urge this jury charge error on appeal, or permit us to consider it.
Moreover, La.Code Civ.P. art. 1792 requires that the judge must charge the jury as to the law applicable to the case. His failure to do so in this case may have been such an egregious error that it needed no objection or assignment of error for us to consider it, pursuant to our authority under La.Code Civ.P. art. 2164. Our supreme court has intimated that Article 1793's requirement of an objection to jury charges as a prerequisite to assigning error on appeal, might conceivably be relaxed where there is "plain, fundamental error". Trans-Global Alloy v. First Nat. Bank, 583 So.2d 443 (La.1991). The federal courts can consider plain, fundamental error even without objection where the outcome of the case might have been different had the error not been made. Branch-Hines v. Hebert, 939 F.2d 1311 (5th Cir. 1991).
In the present case, we have to remember that the trial judge, who knew what proximate cause meant, reached a different result from the jury, which did not know what proximate cause meant. It might be that, instead of reviewing this case for manifest error of the jury's verdict as to proximate cause, we should be reviewing it for manifest error of the trial judge's decision on that issue. I would like to hear arguments from the lawyers about this, too.
NOTES
[*] Judge Yelverton would grant the rehearing and assigns written reasons, see p. 1169.
[1] Proper page number is 291.